UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| WINFRED WILKERSON, | ) |
| --- | --- |
| Plaintiff, | ) ) ) ) |
| v. | ) Civil Case No. 9-2142 (RJL) ) ) |
| WACKENHUT PROTECTIVE SERVICES, INC., | ) ) ) ) |
| Defendant. | ) ) ) ) |

MEMORANDUM OPINION
(September 22, 2011) [Dkt. #14]

Plaintiff, Winfred Wilkerson ("Wilkerson" or "plaintiff"), brought an employment-discrimination action against his employer, Wackenhut Protective Services, Inc.[1] ("Wackenhut" or "defendant"), asserting gender discrimination claims under the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01-2-1401.06. Complaint ("Compl."), Oct. 15, 2009 [Dkt. #1-2]. Defendant removed the case to this Court on November 13, 2009, and later filed a Motion for Summary Judgment. Def.'s Motion for Summary Judgment ("Mot. for Summ. J."), Sept. 2, 2010 [Dkt. #14]. Upon review of the pleadings, the entire record, and the applicable law, defendant's Motion for Summary Judgment [Dkt. #14] is GRANTED.

---

[1] Although Wackenhut Protective Services, Inc., is named in this suit, plaintiff acknowledges that Wackenhut Services, Inc. ("WSI") employed him. See Def.'s Mot. for Summ. J. at 3, n.6.

1

BACKGROUND

I.   Plaintiff's Employment With Wackenhut

Wilkerson is an African American male who was, at the time of filing this action, forty-seven years old. Compl. ¶ 6. Wackenhut provides armed and unarmed security services to government customers such as Walter Reed Army Medical Center ("Walter Reed"). Mot. for Summ. J. at 2; *see also* Def.'s Ex. 2, Paff Decl. ¶ 2 [Dkt. #14-10]. Wackenhut is an equal-opportunity employer whose stated policy prohibits unlawful discrimination, including gender discrimination. Mot. for Summ. J. at 2; Def.'s Wilkerson Dep. Ex. 6, Equal Employment Opportunity Policy [Dkt. #14-2 at 16].

Around August 2008, Wackenhut succeeded Chenega Protective Services ("Chenega") as the security contractor for Walter Reed. Mot. for Summ. J. at 3; Def.'s Ex. 3, Deposition of Dale Paff ("Paff Dep."), June 25, 2010, at 12:18-19 [Dkt. #14-11]. That same month, plaintiff applied for a job as a security officer with Wackenhut. Def.'s Wilkerson Dep. Ex. 3, Wilkerson Employment Application, Aug. 5, 2008 [Dkt. # 14-2]. Wackenhut gave plaintiff a conditional offer of employment, *see* Def.'s Wilkerson Dep. Ex. 5, Aug. 1, 2008 [Dkt. #14-2 at 14], and plaintiff began work shortly thereafter.[2]

---

[2]   During discovery, Mr. Paff, Wackenhut's Regional Manager at that time, learned that plaintiff falsely represented his prior employment on his Wackenhut job application by stating that he had never been dismissed or asked to resign from a previous job. Mot. for Summ. J. at 3-4; *see also* Def. Dep. Ex. 3, Wilkerson Application for Employment, Aug. 5, 2008, at 3 [Dkt. #14-2]. In fact, a prior employer had fired plaintiff for reckless and negligent driving which resulted in plaintiff crashing the employer's van, and for failing to report the accident. *See, e.g.*, Def.'s Ex. 1, Wilkerson Dep. at 20:14-16, 22:12-15, 29:4-19; Def. Dep. Ex. 4, Employee Disciplinary Notice, April 12, 2001 [Dkt. # 14-2 at 7]. The employment application stated that "any misrepresentation, falsification, or omission of this application shall be sufficient reason for refusal or dismissal of . . .

2

## II. Wackenhut Attendance and Discipline Policies[3]

Wackenhut's employee attendance polices are outlined in various company documents, including the Wackenhut Security Officer Handbook ("Handbook"),[4] *see, e.g.*, Def.'s Dep. Ex. 10 [Dkt. #14-3 at 3], and WSI statements of policy. *See, e.g.*, Def.'s Dep. Ex. 12, Performance of Duty Policy Change, Aug. 18, 2008 [Dkt. #14-9]. The Wackenhut Handbook clearly states that grounds for immediate dismissal include "[u]nexcused 'no call, no show' absence(s)." Def.'s Dep. Ex. 10, Part 4 [Dkt. #14-6 at 3]; *see also* Def.'s Dep. Ex. 13, Policy #4, Work Attendance [Dkt. #14-9 at 8] (noting that one "no call/no show" incident "will subject the employee to disciplinary action up to and including termination"). Company policy also emphasizes this point: "the following are examples of actions . . . [which] may result in disciplinary action, up to and including termination: excessive absences or tardiness (even when excused)." Def.'s Dep. Ex. 12, Policy #1, Performance of Duty [Dkt. #14-9 at 5].

The Handbook does not appear to outline specific procedures for handling the request of an officer who wishes to swap shifts with another employee to avoid missing

---

employment," *see* Def.'s Dep. Ex. 3, and plaintiff acknowledged as much during a sworn deposition. Def.'s Ex. 1, Wilkerson Dep. at 14:22-15:17. In a sworn declaration, Paff stated that he would have fired plaintiff had the fraud come to light during plaintiff's employment. Def.'s Ex. 2, Paff Decl. ¶¶ 5-7.

[3]  To the extent plaintiff contests the facts described below, he fails to actually identify genuine issues of material fact because he relies only on bare assertions and conclusory allegations instead of on admissible, record evidence.

[4]  Plaintiff signed a receipt stating that he received, read, and understood the Handbook on August 5, 2008. *See* Def.'s Dep. Ex. 11, Receipt of WSI Employee and/or Security Officer Handbook, Aug. 5, 2008 [Dkt. #14-9].

an assigned shift. However, Wackenhut does follow an unwritten, but "learned procedure" for such requests. *See* Def.'s Ex. 3, Paff Dep., at 51:21-22 [Dkt. #14-11]. Specifically, then-Regional Manager Dale Paff explained that management requires employees to submit a "swap form" detailing information about the employee originally scheduled for a given shift and the employee who has agreed to take over the shift. *See id.* at 60-61. The form, which must be "signed by both employees and approved by management," *id.* at 51:11-17, ensures that an employee is held accountable, a record is made, and management is informed about which employee is responsible for each shift, *see id.* at 52-53; *see also* Def.'s Ex. 4, Dep. of Lt. Victor Spain ("Spain Dep.") [Dkt. #14-12] at 38:3-8 ("Well, they were allowed to change shifts. . . . That was okay. But paperwork had to be done for that."). Indeed, "[a]bsent an official written shift swap, the officer assigned to a shift at Walter Reed Army Medical Center is responsible for manning it." Def.'s Ex. 2, Paff Decl., ¶ 4.

Importantly, although Wackenhut policy does include a "progressive discipline process" in which disciplinary actions may escalate commensurate with the number of an employee's unscheduled absences, *see* Def.'s Dep. Ex. 13, Policy #4 – Work Attendance, at 3, Wackenhut also retains "the absolute right to terminate any employee at any time with or without good cause," Def.'s Dep. Ex. 10, Security Officer Handbook, at 3 § 2.15.

### III. Plaintiff's Request For Vacation

In early September 2008, plaintiff submitted a request to his supervisor, Lieutenant Victor Spain, asking for two weeks of vacation in early October. Mot. for Summ. J. at 5; Pl.'s Opp'n at 4 [Dkt. #20]. Lt. Spain forwarded the request to Chief

Jimmi Brown, who delegated decision-making to Captain Haskins. *See* Def.'s Ex. 1, Wilkerson Dep., at 69-71; *see also* Def.'s Ex. 4, Spain Dep. at 9-11.

At the time, Walter Reed was short-staffed and Wackenhut was trying to reduce overtime expenditures. Def.'s Ex. 3, Paff Dep. 16:6-13, 19:18-20:7; Def.'s Ex. 4, Spain Dep. 39:12-20; Def.'s Ex. 1, Wilkerson Dep. 59:5-60:1. As a result, Capt. Haskins denied plaintiff's request for leave, explaining the short-staff issue to plaintiff in person. Notwithstanding the staff shortages, however, Capt. Haskins agreed to give plaintiff time off *if* plaintiff could find someone to cover his shifts – that is, if plaintiff could successfully complete a shift swap. Mot. for Summ. J. at 5; Pl.'s Opp'n at 4; Def.'s Ex. 1, Wilkerson Dep. 70:20-71:4, 75:2-76:2, 77:12-78:17, 81:15-82:4; Def.'s Dep. Ex. 15, Wilkerson's EEOC Charge of Discrimination [Dkt. #14-9] ("I initially applied to use some of my . . . accumulated leave for a week. Initially, I was turned down and was told that we were short of manpower . . . . Later I was told by my Captain that he would approve leave if I could find a replacement who was willing to work my shifts."). Plaintiff accepted Capt. Haskins' offer to orchestrate a shift-swap in order to take leave. Def.'s Ex. 1, Wilkerson Dep. 79:19-20 ("I said okay. I said, that's a deal.").

In total, plaintiff hoped to take leave – and thus swap duties – for six shifts between October 2 and October 10, 2008. The shifts were scheduled according to plaintiff's normal working days: in his case, for Thursday, Sunday, Monday, Tuesday, Wednesday, and the following Thursday. Pl.'s Opp'n at 4-5; Pl.'s Attach. B, Wilkerson Decl., Oct. 11, 2010 [Dkt. #20-1 at 11], ¶ 5.

Plaintiff contends that he identified three other officers to cover his shifts. Mot.

for Summ. J. at 7; Pl.'s Opp'n at 4-5; Pl.'s Attach. B, Wilkerson Decl., ¶ 5. He maintains that Officer Samuel Addy agreed to work four of the six shifts: Monday, Tuesday, Wednesday, and Thursday. Mot. for Summ. J. at 7; Pl.'s Opp'n at 5; Def.'s Ex. 1, Wilkerson Dep., 70:19-71:9, 82:5-83:2, 84:22-85:15; Def.'s Ex. 5, Addy Dep. 23:15-27:10 [Dkt. #14-13]. Wackenhut acknowledges that Officer Addy *orally* informed Capt. Haskins that he would swap four shifts with plaintiff, and that Capt. Haskins *orally* approved plaintiff's request for time off.[5] Mot. for Summ. J. at 7. But it is undisputed that neither Wilkerson, nor Officer Addy, documented the shift swap, and that Capt. Haskins did not sign any document approving it. *Id.*; *see also* Def.'s Ex. 5, Addy Dep. 24:16-17, 25:9-16, 27:4-5, 28:5.

Nonetheless, Wilkerson took the leave he requested. Indeed, during that time, he attended a training class offered by Chenega Security, the predecessor for the Walter Reed contract, *see* Pl.'s Opp'n at 5, and a Wackenhut competitor. *See also* Pl.'s Attach. B, Wilkerson Decl., ¶ 6. Meanwhile, Officer Addy did not show up for the four shifts he allegedly agreed to cover.[6] Mot. for Summ. J. at 7; *see* Pl.'s Attach. C, Addy Decl., ¶ 10;

---

[5] Plaintiff does not explain or provide evidence pertaining to who agreed to swap with him for the remaining two shifts. Wackenhut suggests that plaintiff "hoped" Officers Pope and Kilgore would cover the remaining two shifts, but plaintiff provides no evidence that either Officer was asked to swap before plaintiff's departure, and offers no evidence that either Officer agreed (much less documented the agreement in writing). *See* Def.'s Ex. 1, Wilkerson Dep. 84:22-85:15, 187:22-188:16 (admitting under oath that he "hadn't spoke[n] with [Officer Kilgore] before [he] departed for [his] vacation"). Thus, plaintiff's assertion – with absolutely no explanation or supporting evidence – that he "arranged for others to cover" does nothing to prove his claim. Pl.'s Opp'n at 16.

[6] In his own declaration, Addy explained that when he called into work the day before the first shift he (orally) agreed to cover for plaintiff, the sergeant on duty stated

6

Def.'s Ex. 3, Paff Dep. 62:14-20. As such, Captains Brown and Haskins reported Wilkerson's absences to Paff, who, as Regional Director, was responsible for recommending disciplinary action for Wackenhut's Walter Reed employees. Mot. Summ. J. at 7; Def.'s Ex. 3, Paff Dep. 5:13-14, 27:2-4, 31:5-9, 43:2-10. In addition, the Captains explained that Wilkerson had missed multiple shifts over the course of that ten-day period.[7] See, e.g., Mot. Summ. J. at 7; Def.'s Ex. 3, Paff Dep. 18:20-20:10, 27:11-17, 31:10-32:14. Paff also learned that Capt. Haskins (and perhaps others) had meaningfully attempted to reach Wilkerson on his cell phone to find out why he had not covered his shifts.[8] See id. at 32:5-14, 40:18-21, 44:11-18.

In sum, Paff concluded that plaintiff had abandoned his job, see, e.g., id. 40:12-21, 44:9-45:7; Def.'s Ex. 1, Wilkerson Dep. 142:21-143:1, and instructed Chief Brown to issue a "job abandonment" letter terminating Wilkerson for missing "ten (10) scheduled

---

that Addy was not listed "anywhere on the schedule." Pl.'s Attach. C, Addy Decl., ¶ 10. This comports with Paff's testimony that "if the vacation was not approved," (and according to Paff, it was not) Wilkerson "would still be scheduled for work on his shift – on the schedule." Def.'s Ex. 3, Paff Dep. 49:8-10. It is undisputed that Addy did not show up for the shifts – the likely result of Addy's assumption, after calling in, "that they must have got somebody else to cover [Wilkerson's] shifts." Pl.'s Attach. C, Addy Decl., ¶ 10. And although no party explicitly makes this point, the evidence manifestly supports the inference that the documentation portion of the "shift swap" procedure exists precisely to avoid the situation described here: missed shifts due to lack of formal communication between employees and employers.

[7]      Paff characterized the missed shifts as plaintiff "in effect" not "show[ing] up for approximately ten days" and being "unable to be contacted." Def.'s Ex. 3, Paff Dep. 20:8-10. He later clarified that he did not contend that plaintiff "missed ten shifts," but rather that "for a period of over ten days we were unable to get in contact with Mr. Wilkerson." Id. 50:1-5.

[8]      Plaintiff denies that anyone called him about missed shifts. See Pl.'s Attach B, Wilkerson Decl., ¶ 7.

7

days of work, without calling or letting [Wackenhut] know your status." Def.'s Ex. 3, Paff Dep. 49:19-51:7; Def.'s Dep. Ex. 16, Letter from J. Brown to Wilkerson, Oct. 16, 2008 [Dkt. #14-9].

After his termination, plaintiff (curiously!) filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). *See* Def.'s Ex. 1, Wilkerson Dep. 75:2-10; Def.'s Dep. Ex. 15, EEOC Charge of Discrimination [Dkt. #14-9]. The EEOC dismissed plaintiff's charge for failure to find any evidence of discrimination against him. Def.'s Ex. 1, Wilkerson Dep. 117:17-22. Wilkerson then filed this civil action.

## ANALYSIS

### I. Standard of Review

#### A. Summary Judgment

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When examining the record, the Court must view all inferences in the light most favorable to the non-moving party. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). But to avoid summary judgment, the non-moving party must introduce specific facts "showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). That evidence "must consist of more than mere unsupported allegations or denial and must set forth specific facts." *Walker v. Dalton*, 94 F. Supp. 2d 8, 10 (D.D.C. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3

(1986)). Indeed, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

### B. Employment Discrimination

Claims under the DCHRA are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must establish a *prima facie* case by proving that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action creates an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If a plaintiff successfully makes a *prima facie* case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the defendant is able to articulate such a reason, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that defendant's stated reasons are actually pretext for discrimination. *Id.; see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

However, at the summary judgment stage, the Court need only resolve one central question: whether the employee "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against [the employee] based on his [protected class]?" *Brady*, 520 F.3d at 494.

## II. Defendant Is Entitled To Summary Judgment Because Plaintiff Offers No Admissible Evidence of Discrimination.

In essence, plaintiff's discrimination claim boils down to this: as a male, he suffered disparate treatment when he was "treated less favorably than females who were taking vacation during th[e] same period of time to attend training for competitor security companies." *See* Pl.'s Opp'n at 7. Because he was asked to complete a shift swap before taking leave, and because he was fired when he did not successfully do so, plaintiff contends that he was "treated much more harshly than female coworkers who had attendance problems and were no call/no shows for several days in a row." *See id.* at 8.

Unfortunately for plaintiff, he offers *no* admissible evidence to prove his claims of disparate treatment. References (and citations) to unsworn and unauthenticated documents pertaining to the discipline of what plaintiff says are similarly situated female employees, *see* Pl.'s Attach. J, Rhyne Notice of Termination [Dkt. #20-1 at 50], Attach. K, Walcott Abandonment Letter [Dkt. #20-1 at 55], have no value since those documents are inadmissible, *see* Pl.'s Opp'n at 7-8; *see also Jackson v. Finnegan et. al*, 101 F.3d 145, 150 (D.C. Cir. 1996) ("Unless the opposing party points to 'affirmative evidence' showing disputed material facts, the court shall enter summary judgment, if appropriate, against the adverse party.") (internal citation omitted). Indeed, it is well established that "[u]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Akers v. Liberty Mut. Grp.*, 744 F. Supp. 2d 92, 97 (D.D.C. 2010) (internal citations omitted);[9] *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to

---

[9] Defendant contends, and I agree, that much of plaintiff's "evidence" is, as a matter

support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

In the same vein, Wilkerson's claims that a female employee requested – and was granted – vacation but was not asked to first complete a shift swap does not create a genuine issue where the only documentation supporting the assertion is unauthenticated and unsworn. *See* Pl.'s Attach. I, Saab Leave Request Form [Dkt. #20-1 at 48]; *see also Akers*, 744 F. Supp. 2d at 97. Personal belief, speculation, and hearsay, however, are simply insufficient to defeat a motion for summary judgment. *See, e.g., Robinson-Reeder v. Am. Council on Educ.*, 674 F. Supp. 2d 49, 52 (D.D.C. 2009). With no actual evidence of disparate treatment before this Court, there is no reason to analyze – much less endorse – these aspects of plaintiff's claims. And in any event, plaintiff's *own* sworn admission – acknowledging that in other instances, Wackenhut has allowed other *male* employees to take time off without requiring them to first complete a shift swap, *see* Def.'s Ex. 1, Wilkerson Dep. 113:19-114:10, 232:4-17, greatly undermines Wilkerson's claim of

---

of law, inadmissible. To wit, plaintiff's Attachments E (Rivera Statement) [Dkt. #20-1 at 37], H (Aponte Statement) [Dkt. #20-1 at 47], I (Saab Leave Request Form) [Dkt. #20-1 at 48], J (Rhyne Disciplinary Record) [Dkt. #20-1 at 50], K (Walcott Disciplinary Record) [Dkt. #20-1 at 55], are unsworn, irrelevant, and/or hearsay and therefore inadmissible. *See* Def.'s Reply at 3-4. As a result, they cannot be considered at summary judgment. Moreover, to the extent that Wilkerson's declaration (Pl.'s Attach. B) and that of Officer Addy (Pl.'s Attach. C), present conclusory beliefs and speculation (not evidence) and inadmissible hearsay, they are unpersuasive. *See Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Affidavits filed by a party in support of or in opposition to a motion for summary judgment must present evidence" and should "follow substantially the same form as though the affiant were giving testimony in court") (internal citation and quotations omitted); *see also* Def.'s Reply at 3-4 [Dkt. #21].

gender discrimination.

Finally, even if plaintiff's utter lack of evidence were not already fatal to his claims[10] (which it most certainly is), he is still unable to prove that Wackenhut's legitimate, non-discriminatory reasons for firing him are pretextual. Plaintiff's mere suggestion – absent admissible, corroborating evidence – that his personal disagreement with the characterization of certain facts either creates a genuine issue or permits the inference of pretext, *see generally* Pl.'s Opp'n at 15-18, does not make it so. For example, although plaintiff offers an unsworn statement from Dale Paff (which cites hearsay from Chief Brown) suggesting that plaintiff *did* submit the requisite shift-swap paperwork, *see* Pl.'s Attach. L, Unsworn and Undated Paff Stmt. at 8 [Dkt. #20-1 at 59], that statement does not create a genuine issue of fact (much less an inference of discrimination) because it is inadmissible. *See Jackson*, 101 F.3d at 150. Plaintiff's unsupported conclusion that "it is clear that in this case Chief Brown made the decision [to terminate] even before any investigation was conducted" does not prove illegal animus, either, and is similarly unavailing. *See* Pl.'s Opp'n at 17; *see also, e.g.*, Pl.'s Opp'n at 16 (unsupported contention that Chief Brown "fabricated" plaintiff's alleged admission). Nor can plaintiff establish pretext by contending that Wackenhut could have, but did not, impose progressive discipline, *see* Pl.'s Opp'n at 7, 16 – especially when Wackenhut policy permitted swift and severe punishment for a single "no show," *see*

---

[10] That is, assuming *arguendo* that plaintiff could establish a *prima facie* case of discrimination. Wackenhut does not concede this point, Def.'s Reply at 9 n.8, and because Wackenhut asserted a legitimate, nondiscriminatory reason for its action, I "need not – *and should not* – decide whether plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494 (emphasis in original).

Def.'s Mot. for Summ. J. at 4.

In contrast to plaintiff's conclusory and unsupported assertions, Wackenhut has offered more than enough evidence to show that it terminated plaintiff for a legitimate and nondiscriminatory reason: plaintiff did not show up for multiple shifts for which he was solely responsible. Ultimately, however, Wackenhut prevails because it must only meet the standard of acting in good faith: "Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believe[d] in the reasons it offers." *Fishbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citations omitted). Looking at the evidence here, it is clear that Wackenhut easily meets this standard. Its explanation is as simple as this: then-Regional Manager Paff attested to his genuine belief – and conclusion, based on the evidence before him at that time – that plaintiff had abandoned his job. *See, e.g.*, Def.'s Ex. 3, Paff Dep. 18:20-20:10, 31:5-32:4, 40:12-21, 44:9-51:7. Paff instructed Chief Brown to issue an abandonment letter, *id.* at 49:19-51:7, which he did. Evidence of Paff's reasonable and honest belief that plaintiff abandoned his job far outweighs the tangled web of unsupported assertions plaintiff weaves to obscure a complete lack of evidence substantiating his claims. *See Vatel v. Alliance of Auto. Manufs.*, 627 F.3d 1245, 1248 (D.C. Cir. 2011) (affirming summary judgment for employer because "it is [the supervisor's] perception that is relevant. Here, the evidence overwhelmingly shows that [the supervisor] honestly and reasonably believed that their working styles were incompatible"). Not only does plaintiff *himself* conceded that Wackenhut "probably did"

13

believe that he had "miss[ed] [his] shift," Def.'s Ex. 1, Wilkerson Dep. 205:10-14 – thus substantiating, under oath, Wackenhut's nondiscriminatory and legitimate belief – he offers no evidence to the contrary. Most unsettling, however, and ultimately fatal to his claims, are Wilkerson's own admission – *under oath* – that he is not aware of any facts to support a conclusion that: (1) Paff, Chief Brown, or Lt. Haskins are prejudiced against men, *see* Def.'s Ex. 1, Wilkerson Dep. 119:4-11, 169:13-16, 215:14-18; or (2) "that Wackenhut terminated [him] because [he is] a man," *id.* at 107:7-11. Thus, it is no surprise that plaintiff's claims must, and will, join the ever-growing pantheon of meritless employment-discrimination claims used as a sword by disgruntled employees in an effort to leverage yet another opportunity with their former employer.[11]

## CONCLUSION

For all of the foregoing reasons, defendant Wackenhut's Motion for Summary Judgment [Dkt. #14] is GRANTED. An order consistent with this decision accompanies this Opinion.

_____
RICHARD J. LEON
United States District Judge

---

[11] Because plaintiff does not survive summary judgment, defendant's argument that this Court can deny relief for any damage or injuries plaintiff sustained beyond June 2010, when Paff discovered that plaintiff lied on his employment application, is moot. *See* Def.'s Mot. for Summ. J. at 14; Def.'s Reply at 14; *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362-63 (1995) (allowing courts to deny reinstatement, front pay, and back pay to employee prevailing on an ADEA claim when the employer presents after-acquired evidence of misconduct "of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge").